# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GREGORY FOLEY,<br><br>                                   Petitioner,<br><br>v.<br><br>SCOTT KERNAN, Secretary, et al.,<br>                                   Respondents. | Case No.:  16cv0408-JLS (BGS)<br><br>**REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE RE: DENYING PETITION FOR A WRIT OF HABEAS CORPUS** |

Gregory Foley (hereinafter "Petitioner") is a state prisoner proceeding pro se and in forma pauperis with a Petition for a Writ of Habeas Corpus filed pursuant to 28 U.S.C. § 2254.  (ECF No. 1.)  He challenges his San Diego Superior Court convictions for two counts of elder abuse likely to cause great bodily injury (one involving his mother and the other his father), and one count of resisting an officer with violence, which included jury findings that he used a deadly or dangerous weapon in all counts and inflicted great bodily injury on his mother, for which he was sentenced to twelve years and four months in state prison.  (Pet. at 1-2.)[1]  Petitioner claims there is insufficient evidence to show he attacked his father with force likely to cause great bodily injury (claim one), the trial court erred in finding his mother incompetent to testify (claim two), the hammer he used to strike his

_____

[1]  All pleading citations are to page numbers as assigned by the Electronic Case Filing ("ECF") system.

father was illegally seized (claim three), his brother testified falsely (claim four), the arresting officers used excessive force and committed perjury (claim five), the chain of custody of the hammer was improper (claim six), and he received ineffective assistance of trial counsel (claim seven).[2] (Id. at 26-60.)

Respondent has filed an Answer and lodged portions of the state court record. (ECF Nos. 26-27.) Respondent contends that claim one is the only claim which was adjudicated on the merits in state court, and argues that the state court adjudication is neither contrary to, nor involves an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts. (Memo. of P&A in Supp. of Answer ["Ans. Mem."] at 11-13.) Respondent argues that the remaining claims are unexhausted because they were presented to the state supreme court in a petition for review on direct appeal without first being presented to the appellate court, thereby depriving the state court of a fair opportunity to address them, but they should be denied notwithstanding the failure to exhaust because they are without merit. (Id. at 13-18.)

Petitioner has filed a Traverse. (ECF No. 36.) He requests an evidentiary hearing and presents new claims of cumulative error and ineffective assistance of trial counsel. (Traverse at 7-55.) Petitioner did not explicitly identify a federal basis for his claims in the Petition, and clarifies in the Traverse that his claims are based on violations of his rights under the Fourth, Fifth, Sixth and Fourteenth Amendments. (Id.)

For the following reasons, the Court finds that the state court adjudication of claim one is neither contrary to, nor involves an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts. The Court finds that the remaining claims should be denied irrespective of a failure to properly present them to the state court because they fail under a de novo review. Finally, the Court finds that an evidentiary hearing is not warranted, and recommends denying the Petition.

---

[2] Petitioner filed an Amended Petition on April 14, 2016, which amended the first page of the Petition in order to name a proper Respondent, but did not add or modify any claims. (ECF No. 9.)

## I.    PROCEDURAL BACKGROUND

In a four-count amended information filed in the San Diego County Superior Court on July 23, 2014, Petitioner was charged with attempted murder in violation of California Penal Code §§ 187(a) and 664 (count one), two counts of willful cruelty to an elder or dependent adult with great bodily injury in violation of Penal Code § 368(b)(1) (counts two and three), and resisting an officer in violation of Penal Code § 69 (count four).  (Lodgment No. 1, Clerk's Transcript ["CT"] at 5-7.)  The amended information alleged that Petitioner personally inflicted great bodily injury during the commission of counts one and two within the meaning of Penal Code § 12022.7(c), and personally used a deadly or dangerous weapon (a hammer during the commission of count three and a knife as to all other counts) within the meaning of Penal Code § 12022.3(b)(1).  (Id.)

On August 6, 2014, the jury indicated they were deadlocked on attempted murder, and a mistrial was declared as to count one.  (CT 189.)  The jury found Petitioner guilty on all remaining counts and returned true findings on all of the great bodily injury and weapon use allegations.  (CT 187-89.)  On September 4, 2014, he was sentenced to twelve years and four months in state prison.  (CT 191.)

Petitioner appealed, raising claim one presented here.  (Lodgment No. 4.)  The appellate court affirmed.  (Lodgment No. 6, People v. Foley, No. D066567, slip op. (Cal.App.Ct. Aug. 12, 2015).)  Petitioner filed a pro se petition for review in the state supreme court presenting all of the claims raised in his Petition here, which was summarily denied on November 24, 2015.  (Lodgment Nos. 7-8.)

## II.    TRIAL PROCEEDINGS

Presentation of evidence at Petitioner's trial began with the jury hearing recordings of two 911 emergency calls placed by Beverly Foley, Petitioner's mother, on September 1, 2013.  (Lodgment No. 3, Reporter's Tr. ["RT"] at 111-12.)  Transcripts are in the record. (Lodgment No. 2, Supplemental Clerk's Tr. at 7-13.)  In the first call, placed at 5:08 p.m., Beverly asked the police to respond because her son is "acting up and threatening as usual." (Id. at 8.)  In the second call, placed at 6:09 p.m., Beverly is heard saying that her son had

attacked her with his fists, that he had a knife, and that she was bleeding to death. (Id. at 11-12.) A male voice can be heard in the background just before the call is disconnected saying: "You're dead. You're fucking dead." (Id. at 12.)

Petitioner's trial counsel requested a competency hearing to establish Beverly Foley's competence to testify at trial, contending that at the preliminary hearing she was unable to recall the events of September 1, 2013, had difficulty tracking questions, gave inappropriate responses, and believed she still lived at home despite the fact that she currently lived in a secure dementia facility. (CT 19.) The Court held a competency hearing outside the presence of the jury at which Beverly Foley testified. (RT 21-45.) Beverly identified Petitioner as her son but asked several times "why are we here?" and "what's this all about?", asked if Petitioner was "on trial for something?", did not know what day of the week it was, thought her husband was at home although he had died six months earlier, was not aware that she lived in a secure dementia facility or that she had been diagnosed with dementia, and did not remember the events of September 1, 2013. (RT 23-37, 42.) The trial judge determined that she no longer had any personal knowledge of the events at issue, and would be permitted only to identify Petitioner as her son, which she did in front of the jury. (RT 49, 68.)

The parties stipulated that Milford Foley, Petitioner's father, died at the age of 86 on January 11, 2014, of natural causes unrelated to the September 1, 2013 incident. (RT 439.) His preliminary hearing testimony was read to the jury. (RT 106-07.) The appellate court noted that Milford "had some difficulty testifying," and that "his testimony was not entirely clear . . . [and] . . . was problematic and somewhat inconsistent." (Lodgment No. 6, People v. Foley, No. D066567, slip op. at 3-5.) Milford testified that he was in his bedroom half asleep about 6:30 p.m. on September 1, 2013, rather than in the living room, because his son, who he identified in court as Petitioner, had been drinking rum and coke, and every time Petitioner drinks rum and coke he ties a sheet to the banister and tries to kill himself. (Lodgment No. 9, Preliminary Hearing Tr. at 49-50.) Milford said he locked himself in his bathroom that day, which was inside his bedroom which he had also locked, and that

Petitioner broke both locks and "had a God damn knife or a hammer and beat on me. And I bit him on the left arm" which caused him to drop the hammer. (Id. at 51-53.) He said Petitioner stabbed him in the back, hit him with an old claw hammer from the garage, and then put his knee on his neck and pinned him to the floor which caused him to pass out. (Id. at 53-56, 58-59, 64-65.) When he awoke, the police were there. (Id. at 56.) Milford said he tried to warn his wife downstairs but was unable to do so. (Id. at 58.)

Christopher Foley testified that Petitioner is his brother, Beverly Foley is his 82 year old mother, his father Milford Foley is dead, and that he and Petitioner have a younger sister and an older half-sister. (RT 70-72.) He said Beverly and Milford purchased a house at 4525 Milano Way in Oceanside, California in the mid-1990s, and that Petitioner moved in with them in January 2013. (RT 71-72.) Christopher said Beverly currently lives in a secure dementia ward because she requires constant monitoring, and although Beverly had begun showing signs of dementia prior to September 2013, her dementia became much more severe as a result of the events of September 1, 2013. (RT 75-76.) He said Milford had a stroke in June 2013, and thereafter had severe difficulty speaking. (RT 76-77.)

Christopher said Petitioner was currently in line to inherit twenty-five percent of Beverly's estate upon her death, about $250,000, and he did not want Petitioner "to have a single nickel" of the money because of "what happened in this case." (RT 77-78.) On September 2, 2013, Christopher, his girlfriend and his sister went to his parents' house to "clean up all the blood." (RT 79.) He said his girlfriend found a hammer at the foot of Petitioner's bed with blood and several of his mother's hairs on the handle, which they immediately placed into a bag and turned over to the police. (RT 79-81, 88.) On September 9, 2013, Christopher took Beverly to the emergency room after she had thrown a glass of water at Milford, and because she was threatening to hurt relatives and strangers. (RT 85-86.) He never had to take her to the hospital for aggressive behavior before, and noticed a decline in her mental health after September 1, 2013. (RT 90.)

Mary Altomare testified that she has lived in the house next to Beverly and Milford Foley for thirteen years and has known the Foleys for twelve years. (RT 92.) She said

they were an elderly couple whose arguments were a regular occurrence, with Beverly typically yelling at Milford. (RT 93, 103.) On one occasion, in April or May of 2013, Altomare was in her bedroom looking down on the Foley backyard when she heard Beverly yell at Milford that he was not pruning a tree properly, and then saw Beverly strike Milford in the face and knock off his glasses. (RT 93-94.) She never saw Milford yell at or strike Beverly. (RT 94.) Altomare said Petitioner moved in with the Foleys in early 2013, and in May or June of 2013 she saw Petitioner walk into the garage and heard Milford, who was just inside the garage, tell him: "You've been drinking. I told you you're not allowed to come in the house if you're drinking." (RT 95-98.) Altomare then saw Petitioner shove Milford aside with two hands on Milford's chest and enter the house, and then heard yelling inside the house. (RT 99-101.)

Mark Wheeler, an Oceanside Police Officer, testified that he responded to 4525 Milano Way in Oceanside on September 1, 2013, just after 5:08 p.m. (RT 115.) Beverly Foley, an elderly female, answered the door, appeared uninjured, and said "they're at it again," which he took to be a reference to her husband Milford Foley and her son Petitioner. (RT 116.) Officer Wheeler spoke to Petitioner, who appeared uninjured and said he had been in a verbal argument with his father. (RT 117.) Milford was not cooperative but did not appear injured. (RT 118.) After ensuring that everyone was safe and advising Beverly that she could obtain a restraining order against her son if she wished to have him removed from the house, Officer Wheeler left. (RT 119.)

Officer Wheeler responded to the house again about an hour later in response to a second 911 call, and was the first officer on the scene. (RT 119-20.) Beverly was leaning against a vehicle inside the open garage, covered in blood with a swollen face and multiple cuts. (RT 122-23.) He asked her who had done that to her, and she said it was her son. (RT 125.) Officer Wheeler's supervisor Lieutenant Cosby arrived and moved Beverly to a police car for safety. (RT 123.) Officer Wheeler remained standing about five feet outside the open garage waiting for backup when Petitioner opened the front door. (RT 124.) Office Wheeler ordered Petitioner to come outside, and he responded: "Fuck you.

Come in and get me," and slammed the door. (RT 125.) Officer Wheeler was concerned that Petitioner had a weapon because Beverly looked as though she had been slashed with a knife, so he waited for back up to arrive. (RT 126-27.).

Officer Wheeler drew a diagram of the interior of the house for an entry team based on his previous visit that day, and the house was surrounded. (RT 127.) Attempts were made to have Petitioner and Milford exit the house, including telephone calls which went unanswered and loudspeaker announcements which were ignored. (RT 129.) After those attempts failed, Officer Wheeler remained at the front door as an entry team entered the house. (RT 128.) During the ensuing thirty to forty-five seconds he heard continuous verbal commands of: "Oceanside police. Get down. Stop," heard four or five 40-millimeter non-lethal rounds being fired, which he said are essentially small rubber balls, and heard one rifle shot. (RT 128-30.) Officer Wheeler then entered the house and saw the entire entry team struggling with Petitioner in his second floor bedroom. (RT 131-32.) Officer Wheeler kicked in the locked door of Milford's bedroom and found him in his bathroom bleeding from an open wound to his back and scratches on his arms, injuries which Milford did not have when Officer Wheeler had visited an hour earlier. (RT 132-34.) He said that Milford was uncooperative, did not want to show the officers his injuries, and had to be physically removed from the bathroom. (RT 134.)

Leonard Cosby, a Lieutenant with the Oceanside Police Department, testified that he was the Watch Commander on the evening of September 1, 2013, and responded to a 911 dispatch where he found an elderly woman seated on the back of a vehicle in a garage with blood flowing copiously from the top of her head to her shoulders and dripping on the ground. (RT 165-69.) The woman, Beverly Foley, when asked: "How did this happen?", told Lieutenant Cosby that: "My son did it with his hands and fists." (RT 171.) A SWAT team was summoned because there was another potential victim in the house, and the officers unsuccessfully tried to contact the occupants before entering. (RT 173-75.) After the SWAT team entered, Lieutenant Cosby heard three "pops" which he associated with 40-millimeter non-lethal rounds, and then heard a rifle shot. (RT 176.)

Ronald Nevares, an Oceanside Police Officer, testified that he made the phone calls and loudspeaker announcements in a failed attempt to have the residents of the house come outside. (RT 188-89.) As he was standing in the garage he heard the crisis entry team make announcements to: "Drop the weapon. Drop the knife. This is the Oceanside Police Department with a K9. Put your hands up." (RT 189.) He heard 40-millimeter rounds fired followed by a rifle shot, and entered the residence where he saw blood and a knife, and saw Petitioner, who looked as though he had been bitten by a police dog, having his wounds treated. (RT 190-91.)

Larry Weber, an Oceanside Police Officer, testified that he was Officer Nevares' partner on September 1, 2013, and was told by Beverly Foley that her elderly husband was mentally able to comprehend the instructions to exit his house and was physically capable of doing so. (RT 197-98) Officer Weber entered the house with five other members of his SWAT team, which included a K9 officer. (RT 204-05.) The SWAT team consisted of Officer Kaldenbach, the designated lethal-use officer armed with an AR-15 automatic rifle, Officer Weber as the designated less lethal-use officer armed with a 40-millimeter launcher which fires a hard rubber sponge the equivalent of a baton strike, an officer designated to give voice commands, an officer designated to place handcuffs on the suspect, and a K-9 officer, all with the goal of using the least amount of force necessary to end the crisis. (RT 203-07.) Upon entering the house, they observed drag marks through blood on the kitchen floor, and saw Petitioner at the top of the stairs. (RT 209-11.)

Petitioner was holding a kitchen knife in his right hand raised over his head, and he told the officers: "Get out of my house." (RT 212.) Officer Weber ordered Petitioner to drop the knife and launched a 40-millimeter round which hit Petitioner in his right leg. (RT 212-15.) The 40-millimeter round had no effect, and two officers went several steps up the staircase ahead of Officer Weber before he fired a second 40-millimeter round. (RT 219-20.) He did not know if the second round hit Petitioner, who was pacing back and forth at the top of the stairs holding the knife and pointing it towards the officers despite repeated commands to drop the knife. (RT 221.) Petitioner was not stumbling or slurring

his words. (RT 222.) Officer Weber fired a third 40-millimeter round which again struck Petitioner in his upper leg and again had no effect. (RT 224-25.) Another officer then launched a 40-millimeter round at Petitioner just as Officer Kaldenbach fired his AR-15 rifle, and Petitioner ran into his bedroom. (RT 225-26.)

Officer Weber said he looked through the open bedroom door and saw Petitioner sitting on his bed with the knife still in his hand raised above his head, and Petitioner again ignored commands to drop the knife. (RT 226.) An officer launched another 40-millimeter round which struck Petitioner in the stomach, which caused him to throw the knife on the bed. (RT 227-28.) Officer Weber said the ensuing struggle to restrain Petitioner was "chaotic" because he was actively resisting being restrained by kicking and throwing punches at the officers, even after the K9 dog had latched on to him, all the while with the knife still within his reach. (RT 228-29.) Officer Weber then struck Petitioner in his torso with the muzzle of his 40-millimeter launcher, which allowed the officers to handcuff him, and they began treating him for the gunshot wound to his back. (RT 229-31.) While Officer Weber was standing next to Petitioner waiting for the medics to arrive, Petitioner said: "I just want to die." (RT 232.) Officer Weber said he had very successfully shot younger, fitter men with his 40-millimeter launcher in the same manner as Petitioner, and was surprised it had no effect on him. (RT 251-52.)

Corey Kaldenbach, an Oceanside Police Officer, testified that he made entry into the house with the SWAT team after verbal efforts to evacuate the occupants had failed. (RT 260-61.) While they were clearing the first floor, an officer yelled "suspect" and Officer Kaldenbach looked up the stairs and saw Petitioner with a knife in his right hand. (RT 261-62.) The officers went up the stairs single file with Officer Weber in front and Officer Kaldenbach second. (RT 263.) Petitioner had the knife in his hand, was pacing back and forth at the top of the stairs, and ignored ten or fifteen commands to drop the knife. (RT 263-64.) Petitioner was about four or five feet away from the officers, where he was able with one quick lunge to make contact with them, and repeated several times: "You don't need to be here. I already cut myself. Go away." (RT 266, 300.) He was not slurring his

words or stumbling, but was swiping the air with the knife as five or six 40-millimeter rounds hit him without any effect, which surprised Officer Kaldenbach. (RT 268.)

Petitioner walked toward the officers, and then turned and walked toward the bedrooms where Officer Kaldenbach had been told Petitioner's father might be, and someone yelled: "Don't let him get to the bedroom," so Kaldenbach shot Petitioner in the back left shoulder with his AR-15 rifle. (RT 269-70, 281-82.) Petitioner flinched and crouched down out of sight and the officers pushed forward. (RT 271.) When they reached the landing Petitioner was not there, but they saw him in his room standing with his back to them. (RT 272.) Petitioner was moving the knife in his right hand around the left side of his neck, and was hit in the back with a 40-millimeter round which spun him around. (RT 273-75.) He sat down on the bed and threw the knife on the bed within his reach. (RT 275-76.) He ignored the commands to lay down on the floor with his hands out, and when he reached for the knife he was struck by a 40-millimeter round in the stomach. (RT 276-77.) Petitioner started to close the door, and Officer Trabelsi released the K9 officer named Max. (RT 277-78.) Officer Max latched onto Petitioner's right arm, and Officer Trabelsi grabbed the knife off the bed and threw it across the room. (RT 278-79.) The team attempted to handcuff Petitioner but he kicked and punched the officers, including Max. (RT 280.) Officer Kaldenbach struck Petitioner in the face with his fist two or three times without effect. (RT 280-81.) The officers subdued Petitioner after each officer grabbed an arm and a leg, and then put direct pressure on the gunshot wound to his back shoulder blade. (RT 281-82.)

Steve Stracke, an Oceanside Police Detective assigned to the Family Protection Unit, testified that he responded to the scene about thirty minutes after the second 911 call was received. (RT 302.) He met Beverly Foley, an elderly woman, who was covered in blood with her right eye swollen shut. (RT 303.) He tried to obtain a statement from her but she was barely conscious and unable to say anything other than her name. (RT 304.) He secured the scene, obtained a search warrant, and accompanied the field evidence technician to collect evidence, which included taking photographs which were shown to

the jury. (RT 305-22.) No hammer was found in Petitioner's bedroom, which Detective Stracke said was littered with copious amounts of medical waste. (RT 327-28.)

Fady Nasrallah, surgical specialist in trauma and critical care, testified that he was called in to consult when Beverly Foley was brought to the hospital on September 1, 2013. (RT 365.) Beverly had three cuts to her scalp, three to her forehead, and two to her right cheek; she had bruising and swelling to the right cheek related to a fracture of the right cheekbone and a fracture of the right eye socket. (RT 366-67.) She had a minor cuts to her left hand, deeper cuts to her right hand, and a deep cut to her left elbow, all which appeared to be defensive wounds. (RT 367, 383.) Dr. Nasrallah said that Beverly suffered from concussion and dementia. (RT 393-94.)

That same day, Dr. Nasrallah treated Petitioner for a gunshot wound to his shoulder, a dog bite to his forearm, and small superficial knife cuts to his neck. (RT 376-78.) He had an entry wound from a bullet, but no exit wound, and a CAT scan revealed eight bullet fragments in his body, which Dr. Nasrallah said was typical when a bullet hits a bone. (RT 387-88.) Petitioner had a blood alcohol content of .23 percent, which could cause a person unaccustomed to drinking to be "falling over and peeing on themselves," but Dr. Nasrallah, who had treated severely intoxicated persons before, said Petitioner did not appear to be drunk, which could be explained if he had acquired a tolerance to alcohol. (RT 394-95.)

Neil Tomaneng, an emergency physician, treated Beverly Foley on September 9, 2013. (RT 333-34.) Beverly was brought in by her son Christopher and her daughter for a psychiatric evaluation because they said she had become violent and was exhibiting angry mood swings ever since she had been attacked a week earlier. (RT 334-37.) They said she had been exhibiting combative and unusual behavior for the past year and a half, but had become more hostile toward her husband and their guests in the past week, and had started carrying a knife around with her. (RT 337-38.) Dr. Tomaneng said Beverly did not know why she had been brought to the hospital, and was transferred to a psychiatric facility where she was diagnosed with acute traumatic stress disorder. (RT 338-39.) He opined that Beverly had suffered a concussion which exacerbated her dementia. (RT 341.)

Petitioner had a prior misdemeanor conviction for elder abuse of his parents arising from events several months earlier, and evidence leading to that conviction was presented to the jury. Johnathan Kislingbury, an Oceanside Police Officer, testified that he responded to the Foley house about 8:05 p.m. on April 19, 2013, in response to a call of a family disturbance. (RT 347.) As he approached the front door, he heard a male voice yell: "Be quiet, go to bed." (RT 348.) Beverly Foley, an elderly woman, answered the door; she appeared scared and upset, and motioned Officer Kislingbury into the house where he saw a broken flower pot on the floor and Petitioner in the kitchen. (RT 348-49.) Beverly seemed afraid to speak in front of Petitioner, so Officer Kislingbury took her to another room, where she spoke quietly and seemed confused and frustrated that he would not just take Petitioner into custody. (RT 351-52.)

Officer Kislingbury went upstairs and encountered Milford Foley, an elderly man holding a flashlight looking scared. (RT 352-53.) Milford walked from his bedroom very slowly and deliberately and told Officer Kislingbury that he did not want to be around Petitioner because he was verbally abusive and threatening when he has been consuming alcohol. (RT 354.) Milford lifted his sleeves and showed Officer Kislingbury injuries he said were caused by Petitioner, including contusions, bruises, and skin tears on both arms. (RT 355.) When asked if he was afraid, Milford said no, not really, because he was able to lock himself in his bedroom to avoid Petitioner. (RT 356.) Petitioner then yelled at Beverly that if he was arrested he would have no choice but to put her and Milford in a nursing home, which upset Beverly, who immediately asked Officer Kislingbury not to arrest Petitioner. (Id.) The parties stipulated that on April 22, 2013, Milford and Beverly Foley contacted the San Diego District Attorney's office and made the following request: "We wish to drop charges. Father partly to blame for trying to get him into his room." (RT 359.) The People rested. (RT 397.)

The parties stipulated that DNA testing of blood stains found on the handle and blade of the knife matched Petitioner's DNA profile and excluded Beverly and Milford Foley, and blood stains on the head of the hammer matched the DNA profiles of Beverly and

Milford and excluded Petitioner as a contributor. (RT 447-48.) Petitioner testified that four or five years before he moved in with his mother and father in January 2013, his mother came to him, showed him bruises, and said her husband had been hitting her for most of their marriage. (RT 449-50.) Petitioner said the property and assets of his parents are in an irrevocable trust benefiting Petitioner and his brother Christopher only, Beverly having removed their two sisters as beneficiaries several years earlier due to a conflict between the sisters and Beverly. (RT 451.) He said that when he first moved in with his parents, they got along fine for the first couple of months, but then began arguing about Beverly wanting to go places and Milford wanting to stay home. (RT 452.) Petitioner said his mother suffers from dementia, and that his father exhibits similar strange behavior, such as hiding in his closet at times. (RT 452-53.)

Petitioner said that on the evening of April 19, 2013, when the police were called to their home and arrested him, his parents had been arguing all day and he was trying to be a go-between, but Beverly did not like him doing so for some reason. (RT 453.) Petitioner said Milford's injuries that day were caused by Beverly grabbing and hitting him. (Id.) He did not tell that to the police because he was trying to protect his mother, just as he was trying to protect her when he admitted in court on April 24, 2013, that he had willfully and unlawfully caused an elder to suffer in that incident. (RT 453, 481-82.)

Petitioner said that on September 1, 2013, his parents had been arguing all day, but without any physical violence, and he was in his bedroom that afternoon drinking 7-up and rum when he heard them arguing in the backyard. (RT 456-57.) He attempted to mediate the dispute but Beverly insisted Milford do yard work in the backyard, which Milford did not like to do, so Petitioner watched television downstairs and continued drinking. (RT 457-58.) They resumed arguing a couple of hours later, and when the police arrived in the late afternoon for the first time that day he thought they were there because of their arguing. (RT 458-59.) Petitioner told the police to speak to his parents, and they left. (RT 459.)

Petitioner said that about half an hour later his parents started arguing again in the backyard, much louder, and they came in the house screaming at each other. (RT 459-60.)

Petitioner said he went into the kitchen and saw them struggling over a kitchen knife, with Beverly holding the knife and bleeding, and Milford trying to grab her hands. (RT 460.) Petitioner was afraid someone was going to be killed, so he grabbed Milford, told him to leave the kitchen, and told Beverly to give him the knife. (RT 460-61.) Beverly had a frightening look in her eyes, as if she was looking at Petitioner but could not see him, and she did not answer him, so he pushed her on the shoulder. (RT 461-62.) She spun around, hit a rounded corner of a counter and dropped the knife. (RT 462.) Petitioner kicked the knife aside and tried to help Beverly to her feet, but she replied: "No. Leave me alone. I'm calling the police." (RT 462-63.) Beverly called the police from the kitchen as Petitioner picked up and held the knife to make sure it was "secure." (RT 463-64.) He denied ever having a hammer. (RT 464.) When Beverly spoke to the 911 operator, instead of accusing her husband like he assumed she would, Petitioner was shocked to hear her tell the police that he had attacked her. (RT 463-64.) Petitioner said he got mad at that point, which is why his voice can be heard on the 911 tape saying: "You're dead. You're fucking dead." (RT 465.) He said it was just a figure of speech and he never intended to hurt her, but was just upset and had "had enough." (RT 465, 493.) He denied ever punching her or cutting her with the knife. (RT 464-65.)

Petitioner said he knew the police were coming so he went upstairs, still holding the knife to keep it "secure," and looked for Milford in Milford's bedroom, but did not see him. (RT 466.) He went to his own bedroom, looked in the mirror, and decided that: "I didn't want to live anymore. . . . I didn't want to deal with it any longer. I was trapped." (RT 466.) He said he stuck the knife in his throat but it was too dull to cut very deeply, and then he heard Milford yell: "Get out of my house." (RT 466.) He said he did not remember going to the front door and telling the police officers to "fuck off and come and get me," and did not hear the loudspeaker announcements. (RT 467.)

Petitioner said that when he came out of his room he encountered Milford standing by the stairs telling Petitioner to "get out of my house," and saw several police officers lined up halfway up the stairs. (RT 468.) The officers told Milford to go to his room and

16cv0408-JLS (BGS)

lock the door, which he did, and Petitioner stuck the knife in his throat again because he wanted to die. (Id.) He was then shot in the leg and stomach with rubber bullets, and because he had had "enough," he turned around, walked into his bedroom, and threw the knife on the floor up against the closet. (RT 468-69.) He knew it was over so he got on his knees, laid his torso across the bed with his hands behind his back, and was attacked by a dog. (RT 469, 480-81.) The dog grabbed his right arm and began shaking him like a rag doll while he gave no resistance whatsoever. (RT 470.) The officers did not enter his room, apparently because they did not want to be in there with the dog either, but stood at the threshold. (RT 470-71.) The dog was eventually removed, the officers entered, and while Petitioner was giving "absolutely" no resistance to being restrained, he was shot in the back from two feet away. (RT 472-73, 509.) He asked the officer: "Why did you shoot me, asshole?", and passed out. (RT 472.) He woke up as the paramedics were strapping him to a board, passed out again, and woke up in a helicopter. (RT 472-73.) Petitioner admitted that Beverly's dementia was worse when she testified at trial than before she was injured on September 1, 2013, and denied shoving Milford in the garage as described by their neighbor Mary Altomare. (RT 486-89.) The defense rested. (RT 512.)

Mark Lavake, an Oceanside Police Detective, was called on rebuttal and testified that an officer-involved shooting investigation confirmed that Officer Kaldenbach's .223 caliber AR-15 discharged one round on September 1, 2013, and that no other officer's firearm fired a round that night. (RT 515-16, 527.) He testified that he would expect to see an exit wound in someone shot at close range with a .223 caliber AR-15 rifle. (RT 515.) He said that no bullet holes were found in Petitioner's bed or bedroom floor. (RT 516.) Although a bullet was not recovered from anywhere in the house, bullet holes were found in a wall and a ceiling of the house on a trajectory exactly as testified to by Officer Kaldenbach, that he shot Petitioner while Petitioner was on the upper landing of the stairs and Officer Kaldenhach was on the stairs looking up. (RT 517-22.) Detective Lavake said those bullet holes were consistent with the AR-15 rifle bullet fragmenting when it hit Petitioner. (RT 520.)

After deliberating about a day and a half, the jury informed the court they were deadlocked on count one (attempted murder of Beverly), and a mistrial was declared as to that count. (CT 184-89.) The jury found Petitioner guilty of: (1) elder abuse likely to cause great bodily injury to Beverly Foley (count two), and found he personally used a deadly or dangerous weapon (a knife) during the commission of that crime, and personally inflicted great bodily injury on her; (2) guilty of elder abuse likely to cause great bodily injury to Milford Foley (count three), and found he personally used a deadly or dangerous weapon (a hammer) during the commission of that crime; and (3) guilty of resisting an officer with violence (count four), and found he personally used a deadly or dangerous weapon (a knife) during the commission of that crime. (CT 126-28.) Petitioner was sentenced to four years on count two, with a consecutive five-year enhancement for the weapon use finding and a consecutive one-year enhancement for the great bodily injury finding; a consecutive one-year term for count three, with a consecutive four-month enhancement for the weapon use finding; and a consecutive eight-month term on count four, with a consecutive four-month term for the weapon use finding, for a total term of twelve years and four months in state prison. (RT 713-15.)

## III. __DISCUSSION__

Petitioner claims that the evidence is not sufficient to support the conviction for elder abuse of his father because there is no evidence he attacked Milford in a manner likely to cause great bodily injury, and no evidence Milford sustained great bodily injury (claim one); the trial judge erred in finding his mother was not competent to testify because she was able to answer a few questions correctly and because competency is for the jury to decide (claim two); the hammer was illegally seized because his brother, his sister, and his brother's girlfriend were trespassing when they found it (claim three); his brother testified falsely because: (a) he testified he was present when the hammer was found despite a police report indicating he said he was downstairs when it was found, which also made his testimony regarding the finding of the hammer improper hearsay, (b) an object that size could not have been missed in the police search, and (c) he wished to prevent Petitioner

from inheriting from their mother (claim four); the arresting officers used excessive force by using a rifle against an unresisting 150-pound, 56 year old man, and committed perjury regarding the shooting because he still has a 9 millimeter bullet in his body from that night, and their testimony and the crime scene evidence should have been excluded as "fruit of the poisonous tree" (claim five); the chain of custody of the hammer was improper and unprofessional because it was picked up with bare hands which contaminated it, and then put in a bag and left overnight on a counter (claim six); and he received ineffective assistance of trial counsel when counsel failed to challenge the police officers' false statements about the type of weapon he was shot with, and failed to object to the introduction of the photographs of blood at the scene because the source of the blood had not been established by scientific testing (claim seven).  (Id. at 26-60.)

Respondent answers that the adjudication of claim one by the state appellate court is neither contrary to, nor involves an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts.  (Ans. Mem. at 11-13.) Respondent argues that the remaining claims are unexhausted because they were presented to the state supreme court for the first and only time in the petition for review, which deprived the state court of a fair opportunity to address them, but they should be denied as meritless.  (Id. at 13-18.)

Petitioner replies that he has established violations of his rights under the Fourth, Fifth, Sixth and Fourteenth Amendments, requests an evidentiary hearing, and presents new claims alleging cumulative error and ineffective assistance of trial counsel based on counsel's request for a competency hearing for his mother.  (Traverse at 7-55.)

## A.   Standard of Review

In order to obtain federal habeas relief with respect to a claim which was adjudicated on the merits in state court, a federal habeas petitioner must demonstrate that the state court adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C.A. § 2254(d) (West 2006). Even if § 2254(d) is satisfied, a petitioner must show a federal constitutional violation occurred in order to obtain relief. Fry v. Pliler, 551 U.S. 112, 119-22 (2007); Frantz v. Hazey, 533 F.3d 724, 735-36 (9th Cir. 2008) (en banc). Furthermore, a petitioner must also show that any constitutional error is not harmless, unless it is of the type included on the Supreme Court's "short, purposely limited roster of structural errors." Gautt v. Lewis, 489 F.3d 993, 1015 (9th Cir. 2007), citing Arizona v. Fulminante, 499 U.S. 279, 306 (1991) (recognizing "most constitutional errors can be harmless.")

A state court's decision may be "contrary to" clearly established Supreme Court precedent (1) "if the state court applies a rule that contradicts the governing law set forth in [the Court's] cases" or (2) "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from [the Court's] precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000). A state court decision may involve an "unreasonable application" of clearly established federal law, "if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." Id. at 407. Relief under the "unreasonable application" clause of § 2254(d) is available "if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question." White v. Woodall, 572 U.S. ___, 134 S.Ct. 1697, 1706-07 (2014), quoting Harrington v. Richter, 562 U.S. 86, 103 (2011). In order to satisfy § 2254(d)(2), the petitioner must show that the factual findings upon which the state court's adjudication of his claims rest are objectively unreasonable. Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

## B. Claim One

Petitioner alleges in claim one that the evidence is not sufficient to support his conviction for elder abuse of his father because the evidence failed to show he used the hammer in a manner likely to cause great bodily injury, and because his father did not

suffer a serious injury but was treated with "a couple of Band-Aids." (Pet. at 20, 26, 30.) Respondent argues that the state court denial of the claim (on the basis that swinging a hammer at a person's face and choking an elderly person into unconsciousness by kneeling on his neck constitutes force likely to cause great bodily injury), is neither contrary to, nor involves an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. (Ans. Mem. at 11-13.)

Petitioner presented this claim to the state supreme court in his petition for review. (Lodgment No. 7.) That petition was denied with an order which stated: "The petition for review is denied." (Lodgment No. 8.) The same claim was presented to the state appellate court on direct appeal. (Lodgment No. 4.) The appellate court denied the claim on the merits in a written opinion. (Lodgment No. 6.)

There is a presumption that "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." Ylst v. Nunnemaker, 501 U.S. 797, 803-06 (1991). Therefore, with respect to claim one, the Court will look through the silent denial of this claim by the state supreme court on direct appeal to the last reasoned state court opinion addressing the claim, the appellate court opinion on direct appeal, which stated:

> We first note, Foley does not challenge his convictions in counts 2 and 4. His only contention on appeal is that the evidence does not support a finding he used force likely to cause great bodily injury in the assault on Milford. His argument is largely based on the fact that Milford only received fairly minor injuries. However minor the injuries may have been to Milford, the force used, such as attempting to hit Milford with a hammer and a placing a knee on Milford's neck until he passed out, is more than adequate to support the conviction.

> When we consider a challenge to the sufficiency of the evidence to support a conviction we apply the familiar substantial evidence standard of review. Under that standard we review the entire record drawing all reasonable inferences in favor of the jury's decision. We do not weigh the evidence or make credibility decisions. Our task is to determine whether there is sufficient, substantial evidence from which a reasonable jury could have

found the elements of the offense have been proved beyond a reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d 557, 575–577; *People v. Bolin* (1998) 18 Cal.4th 297, 331.)

In order to establish that Foley was guilty of willful cruelty to Milford as charged, the prosecution was required to show that the acts were done under circumstances likely to cause great bodily injury. In order to prove such force, it is not necessary that the victim actually be injured. (*People v. Hopkins* (1978) 78 Cal.App.3d 316, 320.) The presence or absence of injury is probative on the issue of the amount of force, but injury alone does not establish the requisite force. (*People v. Muir* (1966) 244 Cal.App.2d 598, 604.) The determination of the amount and nature of the force used is a question of fact to be decided by the jury. (*Ibid.*)

This case illustrates the difference between the role of the original fact finder deciding guilt or innocence and an appellate court reviewing the conviction. Milford's testimony was problematic and somewhat inconsistent. However, Milford insisted that Foley attempted to hit him in the face with a hammer. Milford also maintained that Foley placed his knee on Milford's neck and choked him until he became unconscious.

A jury could have rejected Milford's testimony, but it did not do so. It is apparent the jury accepted Milford's testimony as true. It is not our role to second guess the jury's credibility decision or to reweigh the evidence. If the jury credited Milford's testimony there is plainly enough evidence to show the use of force likely to cause great bodily injury.

Swinging a hammer at a person's face in an effort to hit the person is obviously potentially deadly force. Likewise, using a knee placed against an elderly person's neck to choke the person into unconsciousness poses a grave risk of death or great bodily injury. On this record, it is only fortuitous that the 86–year–old victim was not killed or gravely injured. As we said at the outset of this discussion, there is more than adequate evidence in the record to support the conviction for count 3.

(Lodgment No. 6, <u>People v. Foley</u>, No. D066567, slip op. at 4-6.)

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." <u>In re Winship</u>, 397 U.S. 358, 364 (1970). The Fourteenth Amendment's Due Process Clause is violated, and an applicant is entitled to federal habeas corpus relief,

"if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 324 (1979). The Court must apply an additional layer of deference in applying the Jackson standard when the Court also applies the standards of 28 U.S.C. § 2254(d). Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005). In fact, "Section 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction." Harrington v. Richter, 562 U.S. 86, 103 (2011), quoting Jackson, 443 U.S. at 332 n.5.

Petitioner contended in state court that the hair and blood found on the hammer could have gotten there when he dropped it next to Milford, as Milford testified, without it ever having come into contact with Milford, that Milford testified only that Petitioner "tried" to hit him with the hammer and was not sure if he did, and that Milford's memory of the events was unclear at best, and was possibility manipulated by Christopher or his girlfriend after the fact. (Lodgment No. 4 at 16-24 [ECF No. 27-9 at 23-29].) Given the fact that Milford suffered no injuries, he argued that it is pure speculation that kneeling on an elderly person's neck constitutes force likely to cause great bodily injury. (Id.) Petitioner contends here that he was protecting his parents when he omitted from his trial testimony that when he entered the kitchen he saw his father holding a hammer and his mother holding a knife, that he separated them, and then washed the blood off the knife. (Pet. at 60.)

The jury heard testimony regarding the force Petitioner used against Milford. Milford testified that he locked himself in his bathroom inside his locked bedroom, that Petitioner broke both locks, and "had a God damn knife or a hammer and beat on me. And I bit him on the left arm" which caused him to drop the hammer. (Lodgment No. 9, Preliminary Hearing Tr. at 51-53.) He said Petitioner stabbed him in the back, hit him with the hammer, and then put his knee on his neck and pinned him to the floor which caused him to pass out. (Id. at 53-56, 58-59, 64-65.) Petitioner contends Milford testified that Petitioner tried and failed to hit him with the hammer, relying on a passage in Milford's testimony where he testified that as he was lying on the floor covered in blood Petitioner

"tried to hit me here," and pointed to the right side of his face.  (Id. at 54.)  The prosecutor in closing argument admitted that Milford did not say he was hit in the head with the hammer, just that Petitioner attacked him with a hammer, and admitted that Milford did not have a head injury.  (RT 633.)

The jury was instructed that in order to find Petitioner guilty of elder abuse likely to cause great bodily injury, the prosecution was required to prove beyond a reasonable doubt that Petitioner "willfully inflicted unjustifiable physical pain or mental suffering on another person," and "inflicted suffering on that person under circumstances or conditions likely to produce great bodily harm or death."  (RT 557.)  They were instructed that: "Great bodily injury means significant or substantial physical injury.  It is an injury greater than minor or moderate harm."  (Id.)  The Court finds that it was objectively reasonable for the state appellate court to find that Milford's testimony that Petitioner hit him in the head with a hammer and knelt on his neck until his lost consciousness adequately established the elements of the offense as they are defined by state law.  See Jackson, 443 U.S. at 324 n.16 (holding that federal habeas courts must analyze Jackson claims "with explicit reference to the substantive elements of the criminal offense as defined by state law."); see also Coleman v. Johnson, 566 U.S. 650, ___, 132 S.Ct. 2060, 2065 (2012) ("The jury in this case was convinced, and the only question under Jackson is whether that finding was so insupportable as to fall below the threshold of bare rationality.")

With respect to the contention that Milford's memory was questionable, which was arguably supported by Officer Weber's testimony that he had to kick in the locked bedroom door despite Milford's testimony that Petitioner had earlier broken the lock, or that his memory was influenced by conversations with Christopher, who admitted antagonism toward Petitioner, that evidence was presented to the jury, and this Court must respect the jury's credibility findings.  See Jackson, 443 U.S. at 319 (federal habeas courts must respect the "factfinder's province to determine witness credibility, resolve evidentiary conflicts, and draw reasonable inferences from proven facts," by assuming "the trier of fact resolved all such conflicts in favor of the prosecution.")

In light of the two layers of deference required by <u>Jackson</u> and 28 U.S.C. § 2254(d), <u>see</u> <u>Juan H.</u>, 408 F.3d at 1274, and the admonition that federal habeas relief functions as a "guard against extreme malfunctions in the state criminal justice systems," and not simply as a means of error correction, <u>Richter</u>, 562 U.S. at 103, quoting <u>Jackson</u>, 443 U.S. at 332 n.5, it is clear that the state appellate court reasonably denied claim one on the basis that sufficient evidence was presented at trial to support Petitioner's conviction for elder abuse likely to cause great bodily injury against Milford Foley. The Court finds that the state court adjudication of claim one is neither contrary to, nor involves an unreasonable application of, clearly established federal law. <u>Richter</u>, 562 U.S. at 102; <u>Jackson</u>, 443 U.S. at 324; <u>In re Winship</u>, 397 U.S. at 364; <u>Juan H.</u>, 408 F.3d at 1274. Nor is there any basis to find that the state court adjudication is based on an unreasonable determination of the facts. <u>Miller-El</u>, 537 U.S. at 340.

## C. Exhaustion of Remaining Claims

Respondent contends that claims two through seven were not presented to the state appellate court before they were presented to the state supreme court in the petition for review, which deprived the state court of a fair opportunity to address them, and renders them unexhausted. (Ans. Mem. at 13.) Respondent argues the claims should be denied irrespective of the failure to exhaust because they lack merit. (<u>Id.</u> at 13-14.)

Petitioner presented claims two though seven to the state supreme court for the first and only time in a petition for review on direct appeal. (Lodgment No. 7.) That petition was denied in an order which stated: "The petition for review is denied." (Lodgment No. 8, <u>People v. Foley</u>, No. S229887, order at 1 (Nov. 24, 2015).) The United States Supreme Court has indicated that: "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits *in the absence of any indication or state-law procedural principles to the contrary*." <u>Richter</u>, 562 U.S. at 89 (emphasis added). Respondent relies on the pre-<u>Richter</u> decision of the Ninth Circuit in <u>Casey v. Moore</u>, 386 F.3d 896, 917-18 (9th Cir. 2004), which found that because the Washington State Supreme Court will not grant a petition for

appeal as a matter of right, but only within its discretion, the petitioner had failed to exhaust by failing to present his claims to the lower Washington court before seeking discretionary review in the state supreme court.  Id., citing Castille v. Peoples, 489 U.S. 346, 351 (1989) (holding that absent a decision on the merits by the state high court, the exhaustion requirement was not satisfied by presenting a claim "for first and only time in a procedural context in which its merits will not be considered unless 'there are special and important reasons therefore.'"), quoting Pa. Rules of App. Proc., rule 1114.

California law provides that "as a matter of policy, on petition for review we normally will not consider any issue that could have been but was not timely raised in the briefs filed in the Court of Appeal."  Conservatorship of Susan T., 8 Cal.4th 1005, 1013 (Cal. 1994), citing Cal. Rules of Court, rule 29(b)(1).  The California Supreme Court has noted that Rule 29(b)(1) "is not absolute," because that rule "recognizes that this court may decide 'any issues that are raised or fairly included in the petition or answer.'"  People v. Braxton, 34 Cal.4th 798, 809 (Cal. 2004), quoting Cal. Rules of Court, rule 29(b)(1).[3]

If the Richter presumption applies, the silent denial of claims two through seven should be treated as a denial on the merits of the claims, and this Court "must determine what arguments or theories . . . could have supported the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of" the Supreme Court. Richter, 562 U.S. at 102.  If Castille applies, Petitioner deprived the state court of a fair opportunity to address the merits of his federal claims, and he did not exhaust his state court remedies by presenting claims two through seven in the petition for review.  See Rose v. Lundy, 455 U.S. 509, 515 (1982) (holding that as a matter of federal-state comity, federal habeas courts generally will not consider a claim until the state court have had an

---

[3]  The Court notes that other district courts in California have found, pre-Richter, that a failure to present claims to the California appellate court prior to presenting them to the state supreme court in a petition for review renders them unexhausted.  See Reynoso v. Lamarque, No. 03cv0272-RRB (EFB), 2007 WL 707521 at *7 (E.D. Cal. Mar. 6, 2007); Dixon v. Brown, No. 08cv3725-SBA (PR), 2010 WL 1028720 at *3 (N.D. Cal. Mar. 18, 2010).

opportunity to act upon the claim); Picard v. Connor, 404 U.S. 270, 275 (1971) (noting that the exhaustion requirement assures the state court of the "initial opportunity to pass upon and correct alleged violations of its prisoners' federal rights.")  Of course, the exhaustion requirement applies only to claims which are cognizable on federal habeas, and as discussed below, several of the claims do not satisfy that requirement.  See Acosta-Huerta v. Estelle, 7 F.3d 139, 142 (9th Cir. 1992) (noting that Rose presumes the claims are cognizable on federal habeas, and that it would be futile to require the petitioner to exhaust state court remedies as to claims that "clearly do not rise to the level of alleged deprivation of [federal] constitutional rights and that may be denied summarily on their merits.")

Here, however, the Court need not determine whether Respondent has rebutted the post-Castille presumption in Richter that the state supreme court's silent denial of the petition for review was a denial on the merits of the claims presented, because claims two through seven fail under a de novo review.  See Berghuis v. Thompkins, 560 U.S. 370, 390 (2010) (holding that when it is unclear whether AEDPA deference applies, a federal habeas court may conduct a de novo review to deny a petition but not to grant one); see also 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.")

In order to deny relief on an unexhausted claim under 28 U.S.C. § 2254(b)(2), the claim must not present a "colorable" claim for relief, that is, it must be clear the claim does "not rise to the level of alleged deprivations of constitutional rights."  Acosta-Huerta, 7 F.3d at 142.  As discussed below, most of the claims are sufficiently lacking in merit so as to satisfy that standard.  However, even if any of the claims are "colorable," the Court would recommend finding that Petitioner has satisfied the exhaustion requirement because there is now an absence of state judicial remedies available to him.  See Castille, 489 U.S. at 351 ("The requisite exhaustion may nonetheless exist, of course, if it is clear that respondent's claims are now procedurally barred under [state] law."), citing Engle v. Isaac, 456 U.S. 107, 125 n.28 (1982) ("[The exhaustion] requirement, however, refers only to

remedies still available at the time of the federal petition.")  It appears that if Petitioner were to return to state court to present his claims now, over a year and a half after the state supreme court denied his petition for review, they would be met with a state timeliness bar. See Walker v. Martin, 562 U.S. 307, 312-21 (2011) (holding that California's timeliness rule requiring that a petitioner must seek relief without "substantial delay" as "measured from the time the petitioner or counsel knew, or should reasonably have known, of the information offered in support of the claim and the legal basis for the claim," is clearly established and consistently applied).

Thus, to the extent claims two through seven were not properly presented to the state court, they are now technically exhausted and procedurally defaulted in this Court. Coleman v. Thompson, 501 U.S. 722, 735 n.1 (1991) (holding that a procedural default arises when "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred."); see id. at 729-30 (a procedural default arises from a violation of a state procedural rule which is independent of federal law, and which is clearly established and consistently applied.); Bennett v. Mueller, 322 F.3d 573, 581 (9th Cir. 2003) ("We conclude that because the California untimeliness rule is not interwoven with federal law, it is an independent state procedural ground.")  The Court may reach the merits of a procedurally defaulted claim if Petitioner can demonstrate cause for his failure to satisfy the state procedural rule and prejudice arising from the default, or that a fundamental miscarriage of justice would result from the Court not reaching the merits of the defaulted claim. Coleman, 501 U.S. at 750.

The Court need not make a determination whether Petitioner could make a showing sufficient to excuse any default because claims two through seven are insufficiently meritorious to provide for federal habeas relief under any standard of review, and the Ninth Circuit has indicated that: "Procedural bar issues are not infrequently more complex than the merits issues presented by the appeal, so it may well make sense in some instances to proceed to the merits if the result will be the same." Franklin v. Johnson, 290 F.3d 1223,

1232 (9th Cir. 2002), citing Lambrix v. Singletary, 520 U.S. 518, 525 (1997) ("We do not mean to suggest that the procedural-bar issue must invariably be resolved first; only that it ordinarily should be.")  The standard of review for claims which are technically exhausted and procedurally defaulted is unclear.  Slovik v. Yates, 556 F.3d 747, 751 n.4 (9th Cir. 2009).  Denial of the claims under a de novo review, however, assures a finding that Petitioner is not entitled to federal habeas relief irrespective of any procedural default or failure to exhaust.  See Berghuis, 560 U.S. at 390 (holding that when the standard of review is unclear, a federal habeas court may conduct a de novo review to deny a petition "because a habeas petitioner will not be entitled to a writ of habeas corpus if his or her claim is rejected on de novo review.")

For the reasons discussed below, claims two through seven are clearly insufficiently meritorious to provide for federal habeas relief under a de novo review.  Accordingly, with respect to these claims, the Court recommends denying relief based on a de novo review without determining whether the claims were adjudicated on the merits in state court, and without determining whether Petitioner has exhausted state court remedies.

Under a de novo review, "state court judgments of conviction and sentence carry a presumption of finality and legality and may be set aside only when a state prisoner carries his burden of proving that (his) detention violates the fundamental liberties of the person, safeguarded against state action by the Federal Constitution."  Hayes v. Brown, 399 F.3d 972, 978 (9th Cir. 2005) (en banc).  To the extent the state court's reasoning on related claims is relevant, it must be considered.  See Frantz, 533 F.3d at 738 (holding that even if the state court does not address the constitutional issue, where the reasoning of the state court is relevant, that reasoning must be part of a federal habeas court's consideration even under a de novo review).

### D.     Claim Two

Petitioner contends in claim two that his mother was competent to testify at his trial because she understood the nature of her oath and could remember some of the events of September 1, 2013, and the trial judge therefore erred in finding that she no longer had any

memory of those events and was only competent to identify Petitioner as her son. (Pet. at 20, 26, 28-29.) He points to passages from Beverly's preliminary hearing testimony where she was asked if she remembered calling the police and she answered: "Oh yeah, they had a argument," which he contends was a reference to Petitioner and his father, and when asked if Petitioner had ever hit her, she answered: "No, he's not that kind of kid." (Id. at 28, citing Lodgment No. 9, Preliminary Hearing Tr. at 36, 38.) He claims he was prejudiced by the trial court's refusal to allow her to testify, and that the competency of a witness is for the jury to decide. (Id. at 20; Traverse at 29-34.)

Defense counsel filed a pre-trial motion requesting an evidentiary hearing pursuant to California Evidence Code §§ 402 and 701, stating:

> For a least a one year prior to the alleged incident Ms. Foley has suffered from Dementia. At the preliminary hearing, Ms. Foley was called as a witness by the People. While it is unclear if she was deliberately uncooperative or suffering from the effects of her disease, Ms. Foley was unable to recall any of the events of the alleged incident, had difficulty tracking questions, and offered inappropriate responses to questions. Ms. Foley believed she still resided in the Oceanside home with her husband when in fact she was placed in a skilled nursing facility after this incident. Defense request a hearing pursuant to Evidence Code 402 to determine if Ms. Foley meets the competency grounds established in Evidence Code 701.

(CT 19.)

The trial court granted the defense motion for a hearing. (RT 5.) After the jury was selected but before any evidence was presented or any witness testified, a hearing was held outside the presence of the jury at which Beverly Foley testified. (RT 21-45.) During that hearing she asked the court repeatedly "why are we here?" and "what's this all about?" (RT 23-24, 26.) She was unable to say when she saw Petitioner last, and asked: "Is he on trial for something?" (RT 29-30.) She did not know what day of the week it was, and she thought her husband was at home although he had died six months earlier. (RT 35.) She did not know that she lived in a secure dementia facility or that she had been diagnosed with dementia. (RT 37.) She did not remember being injured on September 1, 2013, and did not remember the police coming to her home that evening. (RT 42.) Defense counsel

cross-examined Beverly with a diary Beverly kept, and confronted her with an entry for April 13, 2013, which stated: "Later in the evening, upstairs the three of us got into an argument, and I got knocked down. Mel also got up, reinjured his – my leg. Made Greg – made Greg leave." (RT 39-40.) Beverly said she always wrote the truth in her diary but did not remember that event. (RT 40.)

After the hearing, the prosecutor indicated that he only intended to call Beverly to testify that Petitioner is her son and that he lived with her in Oceanside, to which defense counsel did not object. (RT 64.) The trial judge found: "For that limited inquiry, I'm going to find that she is capable and does qualify as a witness pursuant to the Penal Code for that limited inquiry and is competent to testify to that." (Id.) After a break, defense counsel indicated that, "for purposes of a thorough defense," she wanted to call Beverly to testify regarding the events of the evening.[4] (RT 46.) The trial judge stated:

> And those are the facts [referring to a stipulation that Beverly's husband was dead at the time of the hearing and Beverly no longer resided in Oceanside] that this court is relying upon to demonstrate to it that Ms. Foley no longer has a memory of events of where she lives, whether her husband's alive, what happened last week, a year ago, several years ago.

> You cross-examined her on writings that purport to document events over her life in the past out of her diary which would actually be, in this court's opinion, much more reliable than her testimony that she's giving here in court.

> So I'm finding that she, Ms. Foley, has no personal knowledge of the matters that occurred on the dates that are alleged in the information, and that personal knowledge is [sic] that she might have had it at one time, but it has now left her. [¶] Under 702, I find she no longer has personal knowledge of the matter and therefore has nothing to testify to other than the fact that she can recognize her child, which I will allow that limited inquiry.[5]

(RT 47-49.)

---

[4] Thus, it does not appear that Petitioner waived his claim as a result of the motion in limine.

[5] California Evidence Code § 702, referred to by the trial judge, provides that "the testimony of a witness concerning a particular matter is inadmissible unless he has personal knowledge of the matter." Cal.Evid.Code § 702.

The California Supreme Court has stated:

> As noted above, a witness must be allowed to testify unless he or she (1) cannot communicate intelligibly, (2) cannot understand the duty of truthful testimony, or (3) lacks personal knowledge of the events to be recounted. While the first two questions are determined entirely by the court, its role with respect to the issue of personal knowledge is more limited. A witness challenged for lack of personal knowledge *must* nonetheless be allowed to testify *if there is evidence from which a rational trier of fact could find* that the witness accurately perceived and recollected the testimonial events. Once that threshold is passed, it is for the jury to decide whether the witness's perceptions and recollections are credible.

People v. Anderson, 25 Cal.4th 543, 574 (2001)

Petitioner cites to passages from Beverly's preliminary hearing testimony where, when asked if she remembered: "something happening where the paramedics had to come to the house or the police?", she answered: "Oh, yeah. [Petitioner and his dad] did get into an argument." (Lodgment No. 9, Preliminary Hearing Tr. at 36.) He also cites to a passage from that hearing where she said she does not have dementia. (Id. at 42.) He argues that although she may have had delusions, the weight of her testimony should have been left to the jury. (Pet. at 28.)

Respondent answers that on the whole there was no error in the finding of incompetence, and that in any case such a competency determination is a matter of state law only and this Court must defer to the state court's determination of state law. (Ans. Mem. at 14-15.) Petitioner replies that his rights to due process and to present a defense as protected by the Sixth and Fourteenth Amendments were violated by not allowing his mother to testify. (Traverse at 29-34.) He also argues that state law was violated because under California Evidence Code § 780, it is for the jury to determine the competence of a witness. (Id.)

"Few rights are more fundamental than that of an accused to present witnesses in his own defense." Chambers v. Mississippi, 410 U.S. 284, 302 (1973). "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees

criminal defendants 'a meaningful opportunity to present a complete defense." <u>Crane v. Kentucky</u>, 476 U.S. 683, 690 (1986), quoting <u>California v. Trombetta</u>, 467 U.S. 479, 485 (1984) ("Under the Due Process Clause of the Fourteenth Amendment, criminal prosecutions must comport with prevailing notions of fundamental fairness.")

"[S]tate and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials. Such rules do not abridge an accused's right to present a defense so long as they are not 'arbitrary' or 'disproportionate to the purposes they are designed to serve." <u>United States v. Scheffer</u>, 523 U.S. 303, 308 (1998), quoting <u>Rock v. Arkansas</u>, 483 U.S. 44, 56 (1988) ("a State may not apply an arbitrary rule of competence to exclude a material defense witness from taking the stand.")

Petitioner has not identified an error in the trial court's exclusion under California Penal Evidence Code § 702 of Beverly's testimony, because the record clearly supports the finding that she was unable to remember the incident. His contention that California Evidence Code § 780 was violated is without merit because that section provides that "*Except as otherwise provided by statute*, the court or jury may consider in determining the credibility of a witness any matter that has any tendency in reason to prove or disprove the truthfulness of his testimony . . ." Cal.Evid.Code § 780 (italics added). As set forth above, California Evidence Code § 702, relied on by the trial judge, provides that "the testimony of a witness concerning a particular matter is inadmissible unless he has personal knowledge of the matter." Cal.Evid.Code § 702. Furthermore, Petitioner cites to passages from Beverly's preliminary hearing testimony, which took place over nine months before she testified at trial. It is clear from her testimony at the pre-trial hearing that she did not remember the events of September 1, 2013. Her son Christopher testified that at the time of trial Beverly's condition had deteriorated to the point which required her to live in a secure dementia ward with constant monitoring for her safety. (RT 75-76.) Dr. Tomaneng testified that when he treated Beverly he consulted with a psychiatrist, and opined that Beverly suffered a concussion on September 1, 2013, which had exacerbated her dementia. (RT 340-41.) Even Petitioner testified that Beverly's dementia was worse when she

testified at trial than before she was injured. (RT 486.) Thus, Petitioner is in essence complaining it is unfair that a witness he played some part in rendering unavailable to testify was unavailable to testify. Petitioner has failed to identify a state law error in excluding his mother from testifying at his trial because he has not identified "evidence from which a rational trier of fact could find that [his mother] accurately perceived and recollected the testimonial events." Anderson, 25 Cal.4th at 574; see also Estelle v. McGuire, 502 U.S. 62, 72 (1991) (holding that to merit federal habeas relief based on an error of state law, the petitioner must show that the error, considered in the context of the trial record as a whole, so infected the entire trial that the resulting conviction violated due process).

However, "the issue for us, always, is whether the state proceedings satisfied due process; the presence or absence of a state law violation is largely beside the point." Jammal v. Van de Kamp, 926 F.2d 918, 919-20 (9th Cir. 1991) ("While adherence to state evidentiary rules suggests that the trial was conducted in a procedurally fair manner, it is certainly possible to have a fair trial even when state standards are violated; conversely, state procedural and evidentiary rules may countenance processes that do not comport with fundamental fairness.") Nevertheless, state evidentiary rules "do not abridge an accused's right to present a defense so long as they are not 'arbitrary' or 'disproportionate to the purposes they are designed to serve." Scheffer, 523 U.S. at 308, quoting Rock, 483 U.S. at 56 ("a State may not apply an arbitrary rule of competence to exclude a material defense witness from taking the stand.") Petitioner has failed to show a federal constitutional violation because he has failed to show there was anything arbitrary about his mother being disqualified as a witness due to her dementia, that her failure to testify deprived him of a meaningful opportunity to present a defense, or that his trial was rendered fundamentally unfair by her failure to testify. Chambers, 410 U.S. at 302; Holmes, 547 U.S. at 324-25; Trombetta, 467 U.S. at 485.

Finally, even if Petitioner could demonstrate an error in excluding his mother as a witness, and assuming he could satisfy the provisions of 28 U.S.C. § 2254(d)(1) or (2),

habeas relief is not available if the error is harmless.  <u>Fulminante</u>, 499 U.S. at 306 (recognizing "most constitutional errors can be harmless.")  Under that standard, habeas relief is not available "unless the error resulted in 'substantial and injurious effect or influence in determining the jury's verdict,' . . . or unless the judge 'is in grave doubt' about the harmlessness of the error."  <u>Medina v. Hornung</u>, 386 F.3d 872, 877 (9th Cir. 2004), quoting <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993) and <u>O'Neal v. McAninch</u>, 513 U.S. 432, 436 (1995).  "There must be more than a 'reasonable possibility' that the error was harmful."  <u>Davis v. Ayala</u>, 576 U.S. ___, 135 S.Ct 2187, 2198 (2015), quoting <u>Brecht</u>, 507 U.S. at 637.

Petitioner has not shown that his mother's testimony was necessary to present a meaningful defense, or for that matter, that she was even a witness favorable to the defense. Rather, the jury heard Beverly's voice on the 911 recordings saying Petitioner is "acting up and threatening as usual," that: "I've been attacked . . . by my son," that Petitioner "had a knife," and "I am bleeding to death."  (Lodgment No. 2, Supplemental Clerk's Tr. at 8, 11-12.)  Officer Cosby testified that when he asked Beverly at the scene how she was injured she told him: "My son did it with his hands and fists." (RT 171.)  A doctor testified that the knife cuts to Beverly's hands and arms were defensive wounds. (RT 383.)  Milford testified that he locked himself in his room that night because Petitioner had been drinking. (Lodgment No. 9, Preliminary Hearing Tr. at 49-59.)  Petitioner's blood alcohol content was .23 percent (RT 386), and a neighbor said she heard Milford tell Petitioner he was not allowed in the house when he had been drinking.  (RT 97.)

Even setting aside the fact that Petitioner relies on Beverly's preliminary hearing testimony which took place over nine months before trial, and setting aside the evidence that her condition had deteriorated by the time of trial, if she had been allowed to testify in front of the jury that Petitioner is not the "kind of kid" that would hit her, the jury would have seen what the parties observed during her testimony at the competency hearing, that the increase in her dementia from the day of the events to the trial, perhaps as a result of the injuries Petitioner was accused of inflicting upon her, prevented her from being a

reliable witness. Petitioner has not demonstrated "a 'reasonable possibility' that [any] error [in excluding her testimony] was harmful." Ayala, 135 S.Ct at 2198, quoting Brecht, 507 U.S. at 637. The Court is not "in grave doubt" that the alleged "error resulted in 'substantial and injurious effect or influence in determining the jury's verdict.'" Medina, 386 F.3d at 877, quoting Brecht, 507 U.S. at 637 and McAninch, 513 U.S. at 436.

The Court finds, based on a de novo review of claim two, there was no federal constitutional violation arising from the exclusion of the testimony of Petitioner's mother at his trial. The Court also finds that any error is harmless. Accordingly, the Court recommends denying habeas relief as to claim two.

### E.    Claim Three

Petitioner contends in claim three that the hammer he was convicted of hitting his father with was illegally seized because it was found when his sister, his brother, and his brother's girlfriend illegally entered his bedroom while trespassing. (Pet. at 20, 26, 30-32, 56.) Respondent answers that even assuming the action of Petitioner's relatives could be attributed to law enforcement so as to implicate his Fourth Amendment rights, he is precluded from bringing such a claim on federal habeas. (Ans. Mem. at 15.)

"[W]here the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." Stone v. Powell, 428 U.S. 465, 494 (1976). Under California law, a defendant can move pretrial to suppress evidence on the basis that the evidence was obtained in violation of the Fourth Amendment. See Cal. Penal Code § 1538.5 (West 2011).

In Gordon v. Duran, 895 F.2d 610 (9th Cir. 1990), the Ninth Circuit found it unnecessary to reach the issue of whether or not the petitioner's Fourth Amendment claim was, in fact, fully and fairly litigated, and held that the mere fact that the state of California provides an opportunity to fully and fairly litigate Fourth Amendment claims through Penal Code § 1538.5 precludes federal habeas review, irrespective of whether or not the petitioner availed himself of the opportunity. Gordon, 895 F.2d at 613-14. Because California

provides a means by which defendants can challenge the constitutionality of searches and seizures, Petitioner's Fourth Amendment claim is not cognizable on federal habeas. See Stone, 428 U.S. at 494; Gordon, 895 F.2d at 613-14.

The Court finds that Petitioner's claim that the hammer was illegally seized is not cognizable on federal habeas, and recommends denying habeas relief as to claim three.

### F. Claim Four

Petitioner contends in claim four that his brother Christopher testified falsely at his trial because: (1) he testified he was present when the hammer was found despite a police report stating he said he was downstairs when it was found, which also made his testimony regarding the finding of the hammer improper hearsay; (2) an object that size could not have been missed in the police search; and (3) Christopher was antagonistic to Petitioner because he wished to prevent Petitioner from inheriting from their parents' estate. (Pet. at 21, 26, 37, 41, 56.)

Respondent answers that the claim relies on minor inconsistencies in Christopher's testimony, which does not support an allegation of perjury. (Ans. Mem. at 16.) Petitioner replies that his Sixth Amendment right to confront the person who found the hammer was violated by the introduction of what he characterizes as Christopher's hearsay testimony that his girlfriend found the hammer at the foot of Petitioner's bed. (Traverse at 22.)

State evidentiary rulings are not cognizable on a federal habeas proceeding unless the admission of the evidence violated Petitioner's due process right to a fair trial. Estelle, 502 U.S. at 70, Gordon, 895 F.2d at 613. In order to establish a due process violation, Petitioner must show that the introduction of the evidence was so prejudicial that it rendered his trial fundamentally unfair. Ortiz-Sandoval v. Gomez, 81 F.3d 891, 897 (9th Cir. 1996); Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991).

The hammer itself was not introduced into evidence at trial, merely photographs of it and a stipulation that blood stains on the hammer head matched the DNA profiles of Beverly and Milford and excluded Petitioner as a contributor. (RT 447-48.) Christopher did not, as Petitioner contends, contradict his statement to the police that he was not present

when it was found. When shown a photograph of Petitioner's bed and asked at trial if that is where the hammer was found, Christopher replied: "I believe that's where it was found. I myself did not personally find it. I had so much going on. I believe Gina found it, and she immediately yelled for me." (RT 80.) Detective Stracke testified that he accompanied the field evidence technician in collecting evidence from the house, but did not find a hammer, although he noted that there were copious amounts of medical waste in Petitioner's bedroom, presumably from the treatment of his gunshot wound and dog bites which required him to be taken to the hospital in a helicopter. (RT 327-28.)

Thus, Petitioner has not established that Christopher testified falsely based on any inconsistency in his statements, or that it was obvious that the hammer could not have been overlooked by the evidence technician. He has failed to demonstrate that the introduction of the testimony regarding finding the hammer was so prejudicial that it rendered his trial fundamentally unfair. Ortiz-Sandoval, 81 F.3d at 897; Jammal, 926 F.2d at 919. Likewise, Petitioner's contention that Christopher's credibility was called into question by his trial testimony that he did not want Petitioner to "have a single nickel" of the inheritance "based on what happened in this case," (CT 78), does not provide for relief because a federal habeas petition is not a proper vehicle for challenging the credibility of a state trial witness. See Jackson, 443 U.S. at 319 (federal habeas courts must respect the "factfinder's province to determine witness credibility."); Schlup v. Delo, 513 U.S. 298, 330 (1995) ("under Jackson, the assessment of the credibility of witnesses is generally beyond the scope of review.")

Neither is habeas relief available for Petitioner's allegation that Christopher's testimony that his girlfriend Gina found the hammer deprived him of his right to confront Gina. The Confrontation Clause does not apply to non-testimonial evidence. Davis v. Washington, 547 U.S. 813, 821 (2006). The United States Supreme Court has indicated that testimonial statements are the functional equivalent of court testimony, such as affidavits, depositions, confessions, or "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be

available to use at a later trial." <u>Crawford v. Washington</u>, 541 U.S. 36, 51-52 (2004). The statement by Christopher's girlfriend that she had found a hammer in Petitioner's bedroom while cleaning the house is not testimonial under <u>Crawford</u>. Even assuming it is, a Confrontation Clause violation is subject to harmless error review. <u>United States v. Nielsen</u>, 371 F.3d 574, 581 (9th Cir. 2004). As discussed below in claim six challenging the chain of custody of the hammer, Petitioner has not shown that the manner in which it was found and turned over to the police had any impact whatsoever on the outcome of his trial. Thus, any confrontation error is harmless because Petitioner has not shown that the manner in which the hammer was found, or his inability to confront the person who found the hammer, had a "substantial or injurious effect or influence in determining the jury's verdict." <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 623 (1993), quoting <u>Kotteakos v. United States</u>, 328 U.S. 750, 765 (1946) ("[I]f one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected.")

The Court finds, based on a de novo review, there was no federal constitutional violation arising from Christopher Foley's trial testimony. Accordingly, the Court recommends denying habeas relief as to claim four.

### G. Claim Five

Petitioner alleges in claim five that the police used excessive force in his arrest and committed perjury at trial, and therefore their testimony and the crime scene evidence should have been excluded as "fruit of the poisonous tree." (Pet. at 21-22, 27, 42-47, 58; Traverse at 9, 35-46.) Specifically, he contends they used excessive force by shooting a 150-pound, 56 year old man point-blank with a rifle after he had surrendered. (<u>Id.</u>) He contends they lied about shooting him with an .223 caliber AR-15 rifle because the treating physician removed a 9-millimeter bullet fragment from his body, and lied about the bullet creating an exit wound in his body and leaving a hole in the ceiling of his parents' house because he still has the 9-millimeter bullet in his body from that night. (<u>Id.</u>)

Respondent answers that the claim of perjury is based on Petitioner's self-serving contention that his version of the events is true so the officers' version must be false, which Respondent contends is irrelevant because federal habeas is not a proper forum to re-litigate a jury determination regarding the credibility of witnesses. (Ans. Mem. at 16-18.) Respondent also argues that the excessive force claim is only cognizable here as a challenge to the sufficiency of the evidence of the conviction for resisting arrest, but that Petitioner does not dispute the evidence that he retreated inside his home after challenging the officers to come and get him, or that force was used only in response to his refusal to drop the knife he was brandishing at the officers. (Id.)

The jury was instructed that Petitioner could not be convicted of resisting an officer if the officers were "unlawfully arresting or detaining [him] or using unreasonable or excessive force," and instructed that an arrest is unlawful "when force is unreasonable or excessive." (RT 560.) The jury heard the testimony of the arresting officers that the 40-millimeter non-lethal rubber rounds had no effect on Petitioner, that he was given as many as fifteen commands to drop the knife before he was shot with a firearm, and that he was only shot with the rifle after he turned toward his father's bedroom with the knife in his hand. The treating surgeon testified that Petitioner did not have an exit wound, and there were eight bullet fragments remaining in his body. The jury heard evidence that the only firearm fired that night was a rifle, that the trajectory of the rifle bullet, as determined from the holes in the wall and the ceiling caused by fragments of the bullet after it hit Petitioner, was consistent with him being shot at the top of the stairs, that there were no bullet holes in his bed or bedroom, and that if he had been shot point-blank he would have had an exit wound. The jury also heard Petitioner's version, that he was attacked by a dog and shot point-blank in the back with a rifle after he disarmed and surrendered. Petitioner admitted he could not remember challenging the officers to come in and get him, and medical evidence established that he had a .23 percent blood alcohol level that evening.

Petitioner states that the physician who operated on him on the night of the incident told his assistant that he removed a fragment of a 9-millimeter bullet from Petitioner's

body, that an MRI shows that he still has a 9-millimeter bullet in his body, and that he informed his defense counsel of those facts prior to trial. (Traverse at 10-11.) The evidence presented at trial that he was shot with a .223 caliber rifle included the testimony of the officer who shot Petitioner, another officer who saw the rifle shot, three other officers who heard a rifle shot, as well as the officer-involved shooting investigation which accounted for all rounds taken into the house by the police except one .223 caliber AR-15 round. Defense counsel argued in closing that the testimony of the officers diverged in numerous respects due to the stressful nature of the situation, which could also explain any inconsistencies in Petitioner's testimony. (RT 619-21.) The prosecutor replied in closing that in the final analysis those inconsistencies were unimportant. (RT 633-34.) Thus, even if Petitioner could prove his contention about the caliber of the bullet, it would have been one additional divergent facet of the police testimony. Because Petitioner states that he informed defense counsel of the issue, and because he has identified no basis for his knowledge of what the surgeon, who testified at trial, told his assistant during Petitioner's surgery, the Court must presume there was no such argument available to the defense. See Yarborough v. Gentry, 540 U.S. 1, 5 (2003) (recognizing a strong presumption that counsel took actions "for tactical reasons rather than through sheer neglect."), citing Strickland v. Washington, 466 U.S. 668, 690 (1984) (holding that counsel is "strongly presumed" to make decisions in the exercise of professional judgment), and Massaro v. United States, 538 U.S. 500, 505 (2003) (noting that the presumption of competence has particular force where a claim is based solely on the trial record).

The evidence was sufficient to support the verdict that Petitioner was guilty of resisting a lawful arrest which did not involve the excessive use of force, and Petitioner has not demonstrated a federal constitutional violation. See Jackson, 443 U.S. at 324 n.16 (holding that federal habeas courts must analyze Jackson claims "with explicit reference to the substantive elements of the criminal offense as defined by state law."); see also Johnson, 132 S.Ct. at 2065 ("The jury in this case was convinced, and the only question under Jackson is whether that finding was so insupportable as to fall below the threshold

of bare rationality.")  The Court must respect the jury's credibility findings regarding the different versions of the events.  <u>See Jackson</u>, 443 U.S. at 319 (habeas courts must respect the "factfinder's province to determine witness credibility, resolve evidentiary conflicts, and draw reasonable inferences from proven facts" by assuming "the trier of fact resolved all such conflicts in favor of the prosecution.")

The Court finds, based on a de novo review, that Petitioner's claim that his federal constitutional rights were violated because the arresting officers committed perjury or used excessive force is without merit.  Accordingly, the Court recommends denying habeas relief as to claim five.

## H.    Claim Six

Petitioner contends in claim six that the chain of custody of the hammer was improper and unprofessional because it was not found when the police searched the house, but later by his relatives, and was picked up with bare hands, contaminating it, and then put in a bag and left overnight on a counter.  (Pet. at 27, 47, 58.)  Respondent answers that a federal habeas court cannot review a question of the admissibility of state evidence, and that the state court determination that the chain of custody was sufficiently satisfactory is binding on this Court.  (Ans. Mem. at 18.)

Defense counsel argued in closing that it was suspicious law enforcement did not find the hammer in Petitioner's bed when they "were all over that bed," that Milford's injuries were not consistent with being hit with a hammer, and there was no evidence of the struggle described by Milford.  (RT 616-17.)  Defense counsel suggested that because Milford and Beverly's DNA were found on the hammer, but not Petitioner's DNA, and given their long history of quarreling with each other, Beverly and Milford may have inflicted their wounds upon each other.  (RT 615-19.)  The jury also heard Petitioner's father testify that Petitioner attacked him with a hammer.  Petitioner speculates the hammer might have gotten contaminated, but speculative allegations are insufficient to challenge a chain of custody finding in state court.  <u>See People v. Hall</u>, 187 Cal.App.4th 282, 294 (2010) ("When there is only the barest speculation that the evidence was altered, it is proper

to admit the evidence over a chain-of-custody objection and let what doubt remains go to its weight."); <u>People v. Catlin</u>, 26 Cal.4th 81, 134 (2001) ("While a perfect chain of custody is desirable, gaps will not result in the exclusion of evidence, so long as the connections offered link the evidence with the case and raise no questions of tampering.") Petitioner's speculative allegation of tampering is also insufficient to establish an entitlement to federal habeas relief. <u>See</u> <u>James v. Borg</u>, 24 F.3d 20, 26 (9th Cir. 1994) (holding that conclusory allegations are insufficient to support granting federal habeas relief); <u>see also</u> <u>Richter</u>, 562 U.S. at 111 ("When defense counsel does not have a solid case, the best strategy can be to say that there is too much doubt about the State's theory for a jury to convict.") Thus, the Court finds that Petitioner has not shown that the manner in which the hammer was found, or its introduction into evidence, rendered his trial fundamentally unfair. <u>See</u> <u>Estelle</u>, 502 U.S. at 70 (state evidentiary rulings are not cognizable on a federal habeas proceeding unless the admission of the evidence violated Petitioner's due process right to a fair trial); <u>Ortiz-Sandoval</u>, 81 F.3d at 897 (in order to establish a due process violation, a petitioner must show that the trial court's ruling was so prejudicial that it rendered his trial fundamentally unfair); <u>Jammal</u>, 926 F.2d at 920 ("Only if there are no permissible inferences the jury may draw from the evidence can its admission violated due process. Even then, the evidence must be of such quality as necessarily prevents a fair trial.")

The Court finds, based on a de novo review, that Petitioner's claim that his federal constitutional rights were violated by an improper and unprofessional chain of custody of the hammer is without merit. Accordingly, the Court recommends denying habeas relief as to claim six.

## I.    Claim Seven

Petitioner contends in his final claim that he received ineffective assistance of counsel because his trial counsel: (1) failed to challenge the police officer's false statements about the type of weapon he was shot with; and (2) failed to object to the introduction of the photographs of blood taken at the scene on the basis that the source of the blood had not been established by scientific testing. (Pet. at 22, 26, 49-55.) Respondent answers that

claim seven is without merit because Petitioner does not explain how defense counsel could have impeached the officers, or what could have been established by scientific testing of the blood. (Ans. Mem. at 18.) Petitioner adds claims that defense counsel was deficient in asking for a competency hearing for his mother, and that the cumulative effect of the trial errors violates federal due process. (Traverse at 29-34.)

For ineffective assistance of counsel to provide a basis for habeas relief, Petitioner must show that counsel's performance was deficient. <u>Strickland</u>, 466 U.S. at 687. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." <u>Id.</u> Petitioner must also show that counsel's deficient performance prejudiced the defense, which requires showing that "counsel's errors were so serious as to deprive [Petitioner] of a fair trial, a trial whose result is reliable." <u>Id.</u> To show prejudice, Petitioner need only demonstrate a reasonable probability that the result of the proceeding would have been different absent the error. <u>Id.</u> at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." <u>Id.</u> Petitioner must establish both deficient performance and prejudice to establish ineffective assistance of counsel. <u>Id.</u> at 687.

Petitioner contends that his defense counsel was deficient in failing to challenge the police officers' version of what type of firearm they used to shoot him. He states that he told defense counsel that the surgeon told his assistant that he removed fragments of a 9-millimeter bullet, and that an MRI shows that he currently has a 9-millimeter bullet in his body, but counsel did not present that evidence at trial. (Traverse at 11.) His surgeon testified at trial that Petitioner had an entry wound from a bullet, but no exit wound, and that a CAT scan revealed eight bullet fragments in his body, which is typical when a bullet hits a bone. (RT 387-88.) Petitioner does not identify the basis for his knowledge that the surgeon, had he been asked by defense counsel at trial, would have testified that the eight bullet fragments came from a 9-millimeter bullet rather than a .223 caliber AR-15 rifle as described by the witnesses and supported by the officer-involved shooting investigation. Petitioner has shown neither deficient performance of counsel in failing to challenge that

evidence, or prejudice as a result of counsel's failure to do so.  See Strickland, 466 U.S. at 689 ("There are countless ways to provide effective assistance in any given case.  Even the best criminal defense attorneys would not defend a particular client in the same way."); Gentry, 540 U.S. at 5 (recognizing a strong presumption that counsel took actions "for tactical reasons rather than through sheer neglect."); Matylinsky v. Budge, 577 F.3d 1083, 1091 (9th Cir. 2009) (holding that a petitioner must overcome a "heavy burden of proving that counsel's assistance was neither reasonable nor the result of sound trial strategy."); Padilla v. Kentucky, 559 U.S. 356, 371 (2010) ("Surmounting Strickland's high bar is never an easy task.")

Petitioner next contends that defense counsel was deficient in failing to object to the introduction at trial of the photographs of the blood at the scene because the source of the blood had not been established by scientific testing.  Several witnesses testified that Beverly was bleeding profusely when the police arrived at her house, and the jury heard Beverly tell the 911 dispatcher that: "I am bleeding to death."  (Lodgment No. 2, Supplemental Clerk's Tr. at 13.)  Officer Weber testified that when the team entered though the back door he saw "a large amount of blood on the kitchen floor," with "what appeared to be drag marks through it."  (RT 209.)  Photographs showing blood in and around the house were shown to the jury.  (RT 309-21.)

Defense counsel filed a pre-trial motion seeking exclusion of photographs which were unduly inflammatory.  (CT 19-20.)  Defense counsel argued to the jury in her closing argument that it was uncertain whose blood was on the floor of kitchen or the patio, because although those areas were swabbed for DNA testing, no evidence was presented regarding whose blood it was.  (RT 614-15.)  In his closing argument, the prosecutor addressed defense counsel's opening statement that "this case is not about graphic photos," apologized for having to show the jurors graphic photographs, and argued that the defense had submitted graphic photographs of Petitioner's wounds in an attempt to garner sympathy for him.  (RT 637.)  Thus, Petitioner has not shown deficient performance regarding a failure to object to the introduction of the photographs of blood on the basis

that the source of the blood had not been established by scientific testing.  See Strickland, 466 U.S. at 687 (a showing of deficient performance "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.")  Petitioner has also failed to show that he was prejudiced because he has not shown a reasonable probability of a different outcome if the jury had not viewed the photographs.  Id. at 694 (a showing of prejudice requires a reasonable probability that the result of the proceeding would have been different absent the error).

The Court has discretion to consider or refuse to consider claims raised for the first time in the Traverse because Petitioner was specifically warned in this Court's October 19, 2016, Order directing a response to the Petition [ECF No. 14 at p. 3-4] that his Traverse "shall not raise new grounds for relief that were not asserted in the Petition.  Grounds for relief withheld until the traverse will not be considered."  See Cacoperdo v. Demosthenes, 37 F.3d 504, 507 (9th Cir. 1994) (stating that court may ignore issue raised for first time in traverse when scope of traverse has been specifically limited by court order and petitioner ignores order to file a separate pleading indicating intent to raise claim).  Even were the Court to exercise its discretion to consider Petitioner's Traverse claim that defense counsel was deficient in requesting that Beverly Foley submit to a competency evaluation prior to testifying at trial, the Court would find the claim to lack merit.  The record supports a finding that it was reasonable trial strategy for defense counsel to request a competency hearing for a prosecution witness who had the potential to provide evidence damaging to the defense and who appeared incompetent during her preliminary hearing testimony.   In any case, after Beverly testified at the pre-trial evidentiary hearing, defense counsel asked to have Beverly testify at trial regarding the events at issue.  (RT 46.)  Thus, Petitioner has not satisfied the deficient performance prong of Strickland.  See Strickland, 466 U.S. at 690 (holding that counsel is "strongly presumed" to make decisions in the exercise of professional judgment); Matylinsky, 577 F.3d at 1091 (holding that a petitioner must overcome a "heavy burden of proving that counsel's assistance was neither reasonable nor the result of sound trial strategy.")  Petitioner has also failed to demonstrate prejudice in

16cv0408-JLS (BGS)

light of the potentially damaging nature of Beverly's testimony as shown by her prior statements to the police accusing Petitioner of hitting her, the 911 calls she made telling the dispatcher that Petitioner had hit her, her defensive wounds, her diary entry stating that she asked Petitioner to leave the house after she had been knocked down in a struggle, and Petitioner's prior conviction for abusing her, coupled with the fact that her testimony at the competency hearing showed she did not recall the events of September 1, 2013. Strickland, 466 U.S. at 694 (prejudice requires showing "a probability sufficient to undermine confidence in the outcome."); Richter, 562 U.S. at 110 ("Representation is constitutionally ineffective only if it 'so undermined the proper functioning of the adversarial process' that the defendant was denied a fair trial."), quoting Strickland, 466 U.S. at 686.

The same is true of the Traverse claim of cumulative error. (Traverse at 34.) "[T]he combined effect of multiple trial court errors violates due process where it renders the resulting trial fundamentally unfair." Parle v. Runnels, 505 F.3d 922, 927 (9th Cir. 2007). Where no single trial error in isolation is sufficiently prejudicial to warrant habeas relief, "the cumulative effect of multiple errors may still prejudice a defendant." United States v. Frederick, 78 F.3d 1370, 1381 (9th Cir. 1996). "Where the government's case is weak, a defendant is more likely to be prejudiced by the effect of cumulative errors." Id.

This is not a case where the prosecution's case was weak. In fact, as discussed throughout this Report, the evidence was extremely strong that Petitioner attacked his parents with force likely to cause great bodily injury, and that he resisted arrest. For that reason, and because there are no errors to accumulate, to the extent the Court would exercise its discretion to address Petitioner's Traverse claim of cumulative error, the Court would recommend denying relief.

Accordingly, based on a de novo review, the Court recommends denying habeas relief as to claim seven and as to the claims raised for the first time in the Traverse. **J.**

**Evidentiary Hearing**

Petitioner requests an evidentiary hearing. (Traverse at 7.) The Court recommends denying Petitioner's request for an evidentiary hearing on the basis that, even assuming the

allegations in the Petition are true, the state court record provides an adequate basis to adjudicate his claims.  See Campbell v. Wood, 18 F.3d 662, 679 (9th Cir. 1994) (holding that an evidentiary hearing is not necessary where the federal claim can be denied on the basis of the state court record, and where the allegations, even if true, do not provide a basis for relief).

## IV.    CONCLUSION

For all of the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the Court issue an Order: (1) approving and adopting this Report and Recommendation, and (2) directing that Judgment be entered denying the Petition.

**IT IS ORDERED** that no later than **September 22, 2017** any party to this action may file written objections with the Court and serve a copy on all parties.  The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **October 6, 2017.**  The parties are advised that failure to file objections with the specified time may waive the right to raise those objections on appeal of the Court's order.  See Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153, 1156 (9th Cir. 1991).

Dated:  September 1, 2017

_____
Hon. Bernard G. Skomal
United States Magistrate Judge